CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 29 2009

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| KEVIN C. UMPHREYVILLE, ) | |
| ) | |
| Plaintiff. ) | Civil Action No. 5:07CV00096 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| CHARLES W. GITTINS, ) | By: Hon. Glen E. Conrad |
| ) | United States District Judge |
| Defendant. ) | |

The plaintiff, Kevin C. Umphreyville, proceeding pro se, filed this diversity action against the defendant, Charles W. Gittins, asserting claims for breach of contract and legal malpractice. The action stems from the defendant's representation of the plaintiff during the course of military justice proceedings at the Marine Corps Recruit Depot in Parris Island, South Carolina. The matter is presently before the court on Gittins' motion for summary judgment. For the reasons that follow, the court will grant Gittins' motion.

### Factual and Procedural Background

Umphreyville previously served as a Lance Corporal in the United States Marine Corps. In March of 2002, Umphreyville was stationed at Parris Island, where he had the military occupational specialty designation ("MOS") of military policeman.

On March 9, 2002, Kayleen Anderson, a 17-year-old woman, accused Umphreyville of sexually assaulting her at a residence within the confines of the Marine Corps installation at Parris Island. During the subsequent Naval Criminal Investigative Service ("NCIS") investigation, another female civilian, Melissa Nortum, came forward and accused Umphreyville of sexually assaulting her in March of 2002.

Based on the information and evidence gathered from the NCIS investigation, Umphreyville was charged with violating four articles of the Uniform Code of Military Justice ("UCMJ"). The first charge was for conspiring to impede an investigation, in violation of Article 81 of the UCMJ, 10 U.S.C. § 881. The second charge involved two specifications of rape, in violation of Article 120, 10 U.S.C. § 920. The third charge was for committing sodomy with Kayleen Anderson, in violation of Article 125, 10 U.S.C. § 925. The fourth charge involved seven specifications of either soliciting indecent acts or using indecent language, in violation of Article 134, 10 U.S.C. § 934.[1]

Mary Fran Quindlen (nee Gallagher) was appointed to serve as Umphreyville's military defense counsel. Given the serious nature of some of the charges, Quindlen recommended that Umphreyville retain civilian counsel to assist with his defense. Quindlen referred Umphreyville to several attorneys, including the defendant, Charles Gittins, a retired Marine Corps judge advocate who resides in Winchester, Virginia.

Gittins was subsequently retained to represent Umphreyville in May of 2002. The terms and conditions of Gittins' representation were outlined in a May 2, 2002 retainer letter addressed to Umphreyville's father. The retainer letter provided, in pertinent part, as follows:

> The purpose of this letter is to confirm the terms and conditions under which I will undertake the representation of your son, Kevin, in connection with the court-martial proceedings now pending preferral at MCRD Parris Island, South Carolina.

---

[1] The court notes that, in the military, allegations of criminal conduct are set out on a charge sheet in the form of charges and specifications. David A. Schlueter, Military Criminal Justice: Practice and Procedure § 6-1(B) (7th Ed. 2008). The charge refers to the applicable punitive article of the UCMJ that the accused allegedly violated, while the specification states the specific facts and circumstances that the prosecution is relying upon to support the charged violation. Id. "Each specification, along with the charge, constitutes a separate accusation." Id.

2

> My attorney's fees for representation in this matter will be as follows:
>
> - $5,000 for representation in the Article 32 hearing, payable by cashier's or certified check at the time I am retained to represent you.
>
> - $9,000 for representation in court-martial proceedings, through submission of post-trial matters to the convening authority in the event of a conviction, payable in full via cashier's or personal check within 2 weeks after the charges are referred to trial. This portion of the fee shall be due only if the charges are referred to trial and shall be considered earned in full in the event I am successful in winning a final dismissal of the charges prior to trial.
>
> In addition to my fees, I will be entitled to payment or reimbursement for costs and expenses incurred in performing services such as photocopying, computerized research, travel (including mileage, parking, lodging, meals), long-distance telephone, and telecopying. Because this case will be tried in Beaufort, South Carolina, I expect that I will be required to make up to three trips to South Carolina, including an overnight trip for the Article 32 hearing, an overnight trip for motions, in the event we have any to litigate prior to trial, and finally, several days for trial, if one is ordered. I will endeavor to keep my expenses to a minimum, consistent with what is necessary to zealously and professionally represent your son in these proceedings.

(Compl. Ex. A). Gittins was subsequently paid $5,000 to represent Umphreyville during the course of the Article 32 proceeding.[2]

After Gittins was retained to represent Umphreyville, Gittins obtained and reviewed the NCIS investigative file. Additionally, Gittins and Quindlen agreed that Quindlen would

---

[2] The court notes that the Article 32 investigation is similar to the civilian grand jury, in that "[b]oth are designed to avoid trials on baseless charges." Schlueter, supra n.1, § 7-2. However, unlike civilian grand jury proceedings, the accused and counsel may attend the Article 32 hearing, and testimony, documents, and other evidence considered by the Article 32 Investigating Officer are available to the defense. Id.

3

interview potential witnesses and assist Gittins in preparing for the Article 32 hearing. However, the attorneys agreed that Gittins would have first-chair responsibility at the hearing.

The Article 32 hearing was conducted by the Investigating Officer on June 11 and 12, 2002. During the hearing, Gittins cross-examined several witnesses called by the government, including Melissa Nortum, one of the alleged rape victims. The other alleged rape victim, Kayleen Anderson, did not appear at the hearing.[3] Gittins did not call any defense witnesses. Instead, Umphreyville tendered an unsworn statement, in which he admitted that he had participated in consensual oral sex with Anderson. Following the Article 32 hearing, Gittins submitted a memorandum to the Investigating Officer, in which Gittins advocated for the dismissal of all of the charges against Umphreyville.

On June 20, 2002, the Investigating Officer submitted his Report and Recommendations to the Commanding Officer. The Investigating Officer recommended the dismissal of the conspiracy charge, both specifications of rape, and four of the seven specifications under Article 134 of the UCMJ. However, the Investigating Officer found that sufficient evidence had been presented to permit the sodomy charge to proceed to court-martial, as well as the three remaining specifications under Article 134. The Investigating Officer further determined that the evidence supported an additional charge for supplying alcohol to a minor, in violation of Article 134. The Investigating Officer recommended that the charges be referred to a summary court-martial.[4]

---

[3] Civilian witnesses cannot be compelled by the government or the accused to attend an Article 32 proceeding. See Schlueter, supra n.1, § 7-2.

[4] The summary court-martial is one of three types of court-martial. It is "designed to dispose of minor offenses in a simplified proceeding," and "consists of one commissioned officer who may, but need not, be a lawyer." Schlueter, supra n. 1, § 1-8(D)(1). "The maximum permissible punishment that may be imposed by a summary court includes confinement at hard labor for one month, forfeiture of two-thirds pay for one month, hard labor without confinement for forty-five days, or restriction for two months." Id.

4

On July 16, 2002, after the Investigator's Report was issued, Gittins sent Umphreyville's father a memorandum analyzing the disposition options, the ranges of potential punishment, and the likelihood of a successful defense. Gittins recommended that Umphreyville enter "a plea of guilty at a summary court-martial to the charges [Gittins] believe[d] the Government [could] and [would] prove at trial – sodomy, solicitation and indecent language." (Def.'s Ex. K).

Rather than referring the remaining charges to a summary court-martial, as recommended by the Investigating Officer, the Commanding Officer ultimately offered to have the charges resolved at an Article 15 nonjudicial punishment ("NJP") proceeding, and Umphreyville accepted the offer.[5] At Quindlen's direction, Umphreyville sent the Commanding Officer a letter on July 18, 2002, which indicated that Umphreyville strongly believed that he could prove his innocence, but that he "would be willing to face any punishment under Non-Judicial Punishment."[6] (Def.'s Ex. P) (emphasis in original). Umphreyville further requested that he "be allowed to retain [his] MOS as a Military Police Officer and not be separated from the Marine Corps." (Def.'s Ex. P.).

---

[5] Nonjudicial punishment is governed by Article 15 of the UCMJ, 10 U.S.C. § 815. This disciplinary procedure "is designed to allow a commander to quickly impose minor punishments for minor offenses committed by members of his command." Schlueter, supra n. 1, § 1-8(C). "[A]lthough the imposition of punishment under Article 15 does not constitute a federal conviction, a variety of due process protections are provided for what is essentially a consent proceeding." Id. at § 3-1. There are four categories of punishment that may be imposed under Article 15: (1) reduction in grade; (2) deprivation of liberty; (3) deprivation of pay; and (4) censure. Id. at § 3-6(A). The commanding officer generally has wide discretion in determining whether to impose punishment and the amount of punishment. Id. at § 3-3. Unless a service member is embarked in or attached to a vessel, the service member may refuse to accept the nonjudicial punishment procedure and demand a trial by court-martial. Id. at § 3-4.

[6] Umphreyville testified at his deposition that Quindlen instructed him to write the letter to the Commanding Officer, and that he did not know whether Gittins was aware that the letter had been written. (Umphreyville Dep. at 115-117).

5

On August 20, 2002, Umphreyville signed a "free and voluntary" typewritten statement regarding the sodomy charge and the remaining specifications under Article 134. (Def.'s Ex. J). With respect to the sodomy charge, Umphreyville stated that he "allowed [Kayleen] A. Anderson, on the morning of 09Mar02, to perform oral sex on [him]," but that he "never asked for or expected it." (Def.'s Ex. J). As for the Article 134 specifications of soliciting indecent acts and using indecent language, Umphreyville admitted that he asked Anderson on March 9, 2002 if she would also sleep with Lance Corporal Marek. Umphreyville emphasized, however, that he was merely joking with Anderson and that he did not mean to imply that he was interested in group sex. Umphreyville also acknowledged that the possibility of a "threesome" involving himself, Lance Corporal Marek, and Melissa Nortum was discussed in Nortum's presence, but that "in reality it was brought up more in [Nortum's] absence." (Def.'s Ex. J).

On August 26, 2002, Umphreyville signed and initialed several documents affirming his understanding of his rights with respect to the NJP process. Umphreyville also acknowledged that he did not have to agree to the process, and that by doing so, was waiving his right to have the remaining charges adjudicated at a court-martial proceeding.

Mary Fran Quindlen met with Umphreyville and discussed the NJP process with him. However, neither Quindlen nor Gittins represented Umphreyville at the NJP hearing. According to Quindlen, "military detailed defense counsel are not permitted to attend or represent accuseds at NJP," and "it was [her] understanding that the Convening Authority disfavored attorneys serving as spokespersons at NJP proceedings." (Quindlen Aff. at para. 37). Consequently,

Quindlen believed that Umphreyville "would be disserved at the NJP if he attended with counsel."[7] (Quindlen Aff. at para. 37).

Umphreyville appeared before his Commanding Officer for the NJP hearing on September 6, 2002. For reasons that are disputed, the hearing was abruptly terminated and rescheduled for September 11, 2002.[8] Between September 6, 2002 and September 11, 2002, neither Umphreyville nor his father contacted Gittins to discuss the case or request Gittins' presence at the second NJP session.

At the completion of the NJP hearing on September 11, 2002, the Commanding Officer found that Umphreyville violated Article 125 of the UCMJ, which prohibits sodomy, by engaging in oral sex with Kayleen Anderson. The Commanding Officer also determined that Umphreyville violated Article 134 by using obscene and indecent language, as charged in three specifications under that article. The Commanding Officer imposed the following punishment: a reduction in pay grade; forfeiture of pay for two (2) months; and restrictions and extra duties for 30 days.

At some point following the NJP proceeding, Umphreyville was notified that his military occupation specialty designation of military policeman was being voided as a result of the NJP disposition. He subsequently attempted to appeal the NJP disposition by filing a request mast

---

[7] The court notes that there is no evidence that <u>Gittins</u> told Umphreyville that he could not be represented by counsel at the NJP proceeding, or that Umphreyville ever requested Gittins' representation in connection with that proceeding.

[8] According to the defendant's evidence, the Commanding Officer asked Umphreyville to leave the first session because the Commanding Officer believed that Umphreyville was acting disrespectfully. However, Umphreyville alleges that the Commanding Officer was under the impression that Umphreyville was going to plead guilty to all of the remaining charges and was caught off guard when Umphreyville proclaimed his innocence.

application with the Commanding Officer. However, Umphreyville later withdrew the application. Although Umphreyville has also attempted to have the NJP disposition removed from his service record by the Board for Correction of Naval Records, he has been unsuccessful.

Umphreyville was honorably discharged from the Marine Corps in 2003, after completing his four-year enlistment. At the time of his voluntary release from active duty, Umphreyville had regained his occupational specialty of military policeman. However, he has since been turned down for at least two jobs in civilian law enforcement and/or security following the performance of a background check.

Umphreyville filed the instant action against Gittins on September 10, 2007, asserting claims for breach of contract (counts I and II) and legal malpractice (counts III, IV, and V). In counts II, III, and IV, Umphreyville alleged that Gittins breached the parties' retainer agreement and committed legal malpractice by failing to adequately prepare for the Article 32 proceeding and by failing to adequately represent Umphreyville's interests during the Article 32 hearing. In counts I and V, Umphreyville alleged that Gittins breached the parties' retainer agreement and committed legal malpractice by failing to prepare Umphreyville for the NJP proceeding and by failing to appear at the NJP proceeding to advocate on Umphreyville's behalf. Umphreyville further alleged that, as a result of Gittins' breach of contract and malpractice, Umphreyville "was injured in the amount of $1,210,090.00, including loss of pay, loss of pay grade toward advancement in the military, loss or damage to future military career, loss or damage to any career in law enforcement, and loss of the monies paid to the Defendant." (Compl. at 17, 18, 20, 21, 23).

The case is presently before the court on Gittins' motion for summary judgment. The court held a hearing on the motion on August 6, 2009. The motion is fully briefed and ripe for ruling.

### **Standard of Review**

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party must set forth more than a "mere . . . scintilla of evidence" to forestall summary judgment. Anderson, 477 U.S. at 252. "Unsupported speculation is not sufficient." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

9

## Discussion

### I. Choice of Law

Because the court's subject matter jurisdiction is premised on diversity of citizenship, the court must first address which state's law governs Umphreyville's claims. In so doing, the court applies the choice-of-law rules of the forum state -- in this case, Virginia. Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 623-624 (4th Cir. 1999) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).

Under Virginia law, claims for legal malpractice and breach of contract by an attorney are one in the same; a claim for legal malpractice, although sounding in tort, is considered a claim for breach of contract. See, e.g., Cox v. Geary, 624 S.E.2d 16, 22 (Va. 2006) ("[A]n action for the negligence of an attorney in the performance of professional services, while sounding in tort, is an action for breach of contract. It is the contract formed between an attorney and a client that gives rise to the attorney-client relationship; but for the contract, the attorney owes no duty to the client.") (internal citation and quotation marks omitted). When claims are contractual in nature, "Virginia adheres to the principle that the law of the place of performance governs questions arising in connection with the performance of [the] contract." Equitable Trust Co. v. Bratwursthaus Mgmt. Corp., 514 F.2d 565, 567 (4th Cir. 1975).

In this case, it appears from the record that Gittins' legal services were to be performed in both Virginia, where Gittins maintained a law practice, and South Carolina, where Umphreyville was stationed. Consequently, the court will consider Gittins' summary judgment motion under Virginia law and South Carolina law. Nonetheless, the court notes that the relevant legal principles are fundamentally the same in both states.

10

## II. The Article 32 Proceeding

In counts II, III, and IV, Umphreyville alleged that Gittins breached the parties' retainer agreement and committed legal malpractice by failing to adequately prepare for the Article 32 proceeding and by failing to adequately represent Umphreyville's interests during the Article 32 hearing. Under Virginia law and South Carolina law, a plaintiff who asserts a cause of action against an attorney for legal malpractice, regardless of whether the action is based in contract or in tort, "must plead and prove that a relationship existed between them which gave rise to a duty, that the attorney neglected or breached the duty, and that the neglect or breach was a proximate cause of loss to the plaintiff." Hendrix v. Daugherty, 457 S.E.2d 71, 74 (Va. 1995); see also Holy Loch Distrib., Inc.. v. Hitchcock, 531 S.E.2d 282, 285 (S.C. 2000) ("To prevail in a legal malpractice claim, [based on negligence, breach of fiduciary duty, or breach of contract,] the plaintiff must satisfy the following four elements: (1) the existence of an attorney-client relationship; (2) breach of duty by the attorney; (3) damage to the client; and (4) proximate causation of client's damage by the breach."); Hewlette v. Hovis, 318 F. Supp. 2d 332, 335 (E.D. Va. 2004) ("[E]ven though the action is for breach of contract, tort principles, including the negligence standard of care . . . , are applicable to a contract action for legal malpractice.") (applying Virginia law).

In this case, it is undisputed that Gittins was retained to represent Umphreyville in connection with the Article 32 hearing, and thus, that the parties had an attorney-client relationship during that particular phase of the military justice proceedings, which gave rise to a duty on the part of Gittins. Nonetheless, the court concludes that Umphreyville has failed to

11

proffer sufficient evidence to establish the requisite breach of duty, and thus, that Gittins is entitled to summary judgment on counts II, III, and IV.

As a general rule, in order to prove the second element of a claim for legal malpractice (breach of duty by the defendant), the plaintiff must establish, by expert testimony, the specific duty of care owed to the plaintiff. See Geiserman v. MacDonald, 893 F.2d 787, 793 (5th Cir. 1990) ("In most legal malpractice cases, 'expert testimony is necessary to establish the standard of care since only an attorney can competently testify as to whether the defendant comported to the prevailing legal standard.'") (quoting R. Mallen & J. Smith, Legal Malpractice § 27.15, at 671-672 (1989)). This is the case in both Virginia and South Carolina. See, e.g., Lyle, Siegel, Croshaw & Beale, P.C. v. Tidewater Capital Corp., 457 S.E.2d 28, 33 (Va. 1995); Smith v. Haynsworth, 472 S.E.2d 612, 613 (S.C. 1996). Exceptions to this rule exist only in those "rare instances" where the acts in question "clearly lie[] within the range of the jury's common knowledge and experience." Beverly Enterprises-Virginia v. Nichols, 441 S.E.2d 1, 3 (Va. 1994); see also Southeastern Hous. Found. v. Smith, 670 S.E.2d 680, 694 (S.C. Ct. App. 2008).

Having reviewed the record, the court concludes that the claims asserted in counts II, III, and IV do not involve the type of rare circumstances in which expert testimony on the standard of care is not required, and that the expert testimony proffered by Umphreyville is insufficient to withstand summary judgment. Indeed, Umphreyville has not presented any expert testimony that identifies the appropriate standard of care owed by an attorney retained to represent a client during the course of an Article 32 proceeding or the way in which such standard was breached in this case. Robert Nunley, Umphreyville's proposed standard of care expert, specifically limited the scope of his analysis to Gittins' performance during the period following the Article 32

12

proceeding; he expressed no opinion regarding whether Gittins' handling of the Article 32 proceeding comported with the applicable standard of care. The court agrees with Gittins that the absence of expert testimony is fatal to Umphreyville's claims that arose from the Article 32 proceeding, and thus, that Gittins is entitled to summary judgment with respect to counts II, III, and IV.[9]

### III. The NJP Proceeding

In counts I and V of his complaint, Umphreyville alleged that Gittins breached the parties' contract and committed legal malpractice by failing to adequately prepare him for the NJP proceeding and by failing to appear at the NJP proceeding to advocate on his behalf. For the following reasons, the court concludes that Gittins is also entitled to summary judgment with respect to these counts. Specifically, the court concludes that no reasonable jury could find that the scope of the parties' attorney-client relationship extended to the NJP proceeding, and thus, that Gittins owed no duty with respect to that proceeding. Moreover, even if Gittins did owe a

---

[9] Alternatively, the court notes that there is also no evidence, expert or otherwise, that Gittins' performance during the course of the Article 32 proceeding was a proximate cause of Umphreyville's claimed damages. As will be discussed infra, "[a] mere allegation of negligence or breach of a duty is not sufficient to support an action for legal malpractice"; instead, "a plaintiff is required to plead [and prove] that he sustained damages proximately caused by the attorney's acts and omissions." Hendrix, 457 S.E.2d at 74-75. To establish proximate cause in a legal malpractice action, the plaintiff must plead and prove that the result in the underlying action would have been different but for the attorney's negligence or breach. Id. Here, Umphreyville has not presented any evidence from which a reasonable jury could find that, absent Gitttins' alleged negligence or breach, the result of the Article 32 proceeding would have been different.

Additionally, the court notes that, to the extent Umphreyville seeks to recover the legal fees paid to Gittins in exchange for his representation at the Article 32 hearing, such fees are not recoverable, since they were not proximately caused by Gittins' alleged malpractice. See Rutter v. Jones, Blechman, Woltz & Kelly, P.C., 568 S.E.2d 693, 694 (Va. 2002) (holding that the legal fee paid to the defendant was not recoverable in a legal malpractice action, since the fee was "merely the agreed-upon cost of the service, the consideration given for the contract, and not the damage or injury arising from the breach of contract").

13

duty to Umphreyville and the duty was breached, Umphreyville has failed to offer any competent evidence from which a reasonable jury could find that the breach was the proximate cause of his claimed damages.

### A. The Attorney-Client Relationship

When an attorney's alleged negligence or breach of contract involves a failure to act, there can be no negligence or breach absent a duty to act. Macawber Engineering, Inc. v. Robson & Miller, 47 F.3d 253, 256 (8th Cir. 1995). "An attorney's duty to act arises from the attorney-client relationship," and the extent of the attorney's duty necessarily depends on the scope of the relationship. Id. Thus, proof of an attorney-client relationship is essential to establishing a claim for legal malpractice. See, e.g.,Carstensen v. Christland Corp., 442 S.E.2d 660, 668 (Va. 1994); American Fed. Bank, FSB v. Number One Main Joint Venture, 467 S.E.2d 439, 442 (S.C. 1996). Whether an agreement employing an attorney to handle a particular matter is express or implied, there must be "some indication that the advice and assistance of the attorney was sought and received." Carstensen, 442 S.E.2d at 668; see also DeVaux v. American Home Ins. Co., 444 N.E.2d 355, 357 (Mass. 1983) (holding that "[t]he agreement or consent of an attorney to represent a prospective client in a particular matter does not create an attorney-client relationship as to other affairs of the client").

In the instant action, as previously stated, it is undisputed that an attorney-client relationship was established in May of 2002, when Umphreyville's father retained Gittins to represent Umphreyville. The record reveals, however, that the scope of the parties' attorney-client relationship was limited. Gittins' retainer letter to Umphreyville's father, which purported

14

to "set[] forth completely the terms of [the representation] agreement," expressly provided that Gittins would represent Umphreyville at the Article 32 hearing for a flat fee of $5,000 "payable . . . at the time [Gittins was] retained to represent [Umphreyville]." (Compl. Ex. A). The letter further provided that Gittins would represent Umphreyville during the course of any subsequent court-martial proceedings for a flat fee of $9,000, but that "[t]his portion of the fee [would] be due only if the charges [were] referred to trial." (Compl. Ex. A). Here, of course, none of Umphreyville's charges were referred to trial by court-martial. Instead, the most serious charges were dismissed following the Article 32 hearing, at which Umphreyville was represented by Gittins, and the remaining charges were disposed of by Umphreyville's Commanding Officer at an administrative NJP proceeding. The NJP proceeding was neither part and parcel of the Article 32 proceeding for which Gittins was retained to provide representation, nor a trial by court-martial. Consequently, the court concludes that the retainer letter provides no basis upon which a reasonable jury could find that the NJP proceeding fell within the scope of the parties' attorney-client relationship.

In addition, there is no evidence that Umphreyville or his father ever requested Gittins' representation at the NJP proceeding, or that Gittins ever expressly or implicitly agreed to provide such representation. To the contrary, Umphreyville admitted at his deposition that he "[n]ever specifically ask[ed] Mr. Gittins to come into town and deal with the NJP," and that he never contacted Gittins to request his assistance at the rescheduled NJP hearing after the

15

Commanding Officer abruptly ended the first session.[10] (Umphreyville Dep. Tr. at 120-121). Likewise, Umphreyville's father testified that he last talked to Gittins on July 16, 2002, that he did not rely on Gittins to do anything after that date, and that neither he nor his son contacted Gittins to request Gittins' representation at the NJP proceeding. (Eric Umphreyville Dep. Tr. at 95-104). While both Umphreyville and his father emphasized during their depositions that Mary Fran Quindlen advised them that Umphreyville could not be represented by an attorney at the NJP hearing, there is no evidence that Umphreyville or his father requested Gittins' advice on this issue or any other issue related to the NJP process.

In response to Gittins' motion for summary judgment, Umphreyville cites to the affidavit from his proposed expert, Robert Nunley, in which Nunley stated, in a conclusory fashion, that Gittins owed a "continuing obligation" to Umphreyville during the course of the NJP proceeding. (Nunley Aff. at 1). Given the absence of any factual basis for Nunley's statement, the court is convinced that Nunley's affidavit fails to create a genuine issue of material fact on this issue. See Macawber Engineering, Inc., 47 F.3d at 257 (emphasizing that the affidavit of Macawber's expert merely assumed that the attorneys had a duty to act and that "[a]n expert cannot create a duty . . . where no underlying duty exists").

---

[10] The court notes that Gittins testified at his deposition that he recalled having a phone conversation with Quindlen and Umphreyville at some point following the Article 32 proceeding, during which Quindlen "passed on what she knew about what the command was proposing to do," i.e., "that they were going to take [Umphreyville] to NJP" on the remaining charges. (Gittins Dep. Tr. at 44-45). While Gittins testified that he subsequently suggested, during the same conversation, that Umphreyville "remain silent, keep [his] mouth shut, take [his] punishment, and leave" (Gittins Dep. Tr. at 45), there is no evidence that Umphreyville or his father requested Gittins' representation in connection with the NJP proceeding, and the court is convinced that no representation agreement can be implied from the limited discussion described by Gittins.

In sum, the court concludes that while an attorney-client relationship undisputedly existed between Gittins and Umphreyville during the course of the Article 32 proceeding, no reasonable jury could find that the scope of that relationship extended to the NJP proceeding. Accordingly, Gittins owed no duty to Umphreyville during the course of that proceeding.

### B. Proximate Cause

The court also concludes that even if an attorney-client relationship existed between Umphreyville and Gittins at the time of the NJP proceeding, which gave rise to a duty of care, and even if the duty was breached, Gittins is nonetheless entitled to summary judgment. It is well-established that proof of negligence or breach of contract, alone, is insufficient to prevail in a legal malpractice action. Hendrix, 457 S.E.2d at 74-75. The plaintiff must also prove that the attorney's negligence or breach of duty proximately caused the damages claimed. Id.; see also Campbell v. Bettius, 421 S.E.2d 433, 436 (Va. 1992); Hall v. Fedor, 561 S.E.2d 654, 656 (S.C. Ct. App. 2002). This Umphreyville has failed to do.

Under Virginia law and South Carolina law, in order to establish proximate cause in a legal malpractice action, the plaintiff must present sufficient evidence from which a reasonable jury could find that, but for the alleged malpractice, the result would have been different in the underlying action. See Williams v. Joynes, 677 S.E.2d 261, 264 (Va. 2009); Doe v. Howe, 626 S.E.2d 25, 30 (S.C. Ct. App. 2005). This is true regardless of whether the legal malpractice action is brought in contract or in tort. See, e.g., Brown v. Slenker, 220 F.3d 411, 426 (5th Cir. 2000) (holding that the "same showing of proximate cause" was required with regard to the plaintiff's claim that the attorney breached the parties' contract by "failing entirely to represent the [plaintiff]," as was required with regard to the plaintiff's claim for legal malpractice)

(applying Virginia law); see also Hendrix, 457 S.E.2d at 73-74 (affirming a demurrer to a legal malpractice action alleging negligence and breach of contract, since the plaintiffs "failed to allege that they would have prevailed in the underlying action but for the negligence of the defendant attorneys").

In response to Gittins' motion for summary judgment, Umphreyville argues that his claimed "harm and damages . . . would not have occurred if all [of the] charges had been dismissed." (Pl.'s Resp. at 9). However, Umphreyville has not proffered any evidence from which a reasonable jury could find that his charges would have been dismissed at the NJP hearing, or that he would have otherwise obtained a more favorable outcome, but for Gittins' alleged negligence or breach of contract.

Although Umphreyville's proposed expert witness, Robert Nunley, opined in his 2008 affidavit that Umphreyville suffered "adverse consequences and injuries to a then-promising Marine Corps career and his future job and earning prospects" as a result of the NJP hearing (Nunley Aff. at 2), Nunley was unable to testify at his subsequent deposition that, in the absence of Gittins' alleged malpractice, Umphreyville would have obtained a more favorable result. Indeed, when Nunley was asked if he had "any opinion as to whether the result [of the NJP] would have been different" if Umphreyville had "proceeded to the NJP with counsel and pled not guilty and had counsel state his position and present witnesses," Nunley testified that he "[could]n't say one way or the other." (Nunley Dep. at 120). Likewise, Nunley "[could]n't say" whether Umphreyville would have fared better if he had refused to participate in the NJP process and instead demanded a trial by court-martial. (Nunley Dep. at 122). To the contrary, Nunley specifically acknowledged that there was "a possibility . . . that [Umphreyville] could have had a

18

conviction" if he had proceeded to a court-martial proceeding, which would have given rise to more serious consequences than Umphreyville faced by electing to have the charges disposed of by his Commanding Officer at a NJP proceeding.[11] (Nunley Dep. at 122).

Umphreyville's only other evidence in this regard is an affidavit from Richard Van Bortel, a retired Marine First Sergeant who was present when Umphreyville appeared before the Commanding Officer for the NJP hearing. In the affidavit, Van Bortel stated that Umphreyville "made every effort to prove his innocence," but that "Umphreyville's plea of 'not guilty' was rejected." (Van Bortel Aff. at 1). Van Bortel further averred that "there may well have been a different result" if "Umphreyville had been represented by a competent attorney." (Van Bortel Aff. at 2). However, Van Bortel did not set forth any factual basis or reasoning for this lay opinion, and the affidavit provides no indication that Van Bortel "is competent to testify on the matter[] stated." Fed. R. Civ. P. 56(e). It is well-established that "[s]uch conclusory affidavits are insufficient to survive a motion for summary judgment."[12] Cottom v. Town of Seven Devils,

---

[11] The court notes that Umphreyville has repeatedly admitted that he allowed 17-year-old Kayleen Anderson to perform oral sex on him, and that the record reveals that it was that sexual act which gave rise to the sodomy charge. During Robert Nunley's deposition, Nunley acknowledged that "what's not sodomy" in the "outside civilian world . . . could very well be sodomy in the military." (Nunley Dep. at 118).

[12] The court also notes that Van Bortel's affidavit provides no indication that he was aware of Umphreyville's August 20, 2002 typewritten statement, in which Umphreyville admitted to (1) engaging in oral sex with Anderson; (2) jokingly asking her to sleep with Lance Corporal Marek; and (3) discussing the possibility of a threesome involving himself, Marek, and Melissa Nortum in Nortum's presence. The United States Court of Appeals for the Fourth Circuit has held that a witness's lay opinion is insufficient to warrant denial of summary judgment when the witness is unaware of facts that are relevant to the issue on which the witness's opinion is offered. Waterman v. Batton, 393 F.3d 471, 479 n.8 (4th Cir. 2005) ("Even ignoring the conclusory nature of the lay opinions, those opinions do not create a genuine issue of fact because the witnesses were unaware of the fact most critical to the probable cause analysis.").

19

30 F. App'x 230, 235 (4th Cir. 2002); see also Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) ("Summary judgment affidavits cannot be conclusory.").

Based on the foregoing, the court concludes that Umphreyville has failed to come forward with sufficient evidence, expert or otherwise, that would permit a reasonable jury to find that Umphreyville's claimed damages were proximately caused by Gittins' alleged negligence or breach of contract. Consequently, on this alternative ground as well, Gittins is entitled to summary judgment on counts I and V.

## Conclusion

For the reasons stated, the court will grant the defendant's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to the plaintiff and all counsel of record.

ENTER: This 29th day of September, 2009.

/s/ Jack Conrad
United States District Judge